MARY DELORAC, APPELLEE, V. G. R. CONNA, IM-
PLEADED WITH ELIZABETH M. SAFFORD ET AL.,
APPELLANTS.

[FILED JULY 1, 1890.]

Fraud: DEEDS: CANCELLATION. The defendant, E. M. S., a resi-
dent of California, fell heir to an undivided one-third of 320
acres of land, situated near Weeping Water, Nebraska, worth
from $25 to $30 per acre, which she had never seen and had no
knowledge of its location or value. The plaintiff, desiring to
purchase the real estate, visited E. M. S. and her husband at
their home in Oakland, California, and represented to them that
the land was wild and unproductive, and that $10 per acre was
far above its real worth. Relying upon such statements, the
defendants sold and conveyed the property to the plaintiff. *Held*,
That the vendors were entitled to have the deed canceled, on ac-
count of the misstatements of the vendee.

APPEAL from the district court for Cass county. Heard
below before CHAPMAN, J.

*Byron Clark*, for appellants, cited : *Harkness v. Fraser*,
12 Fla., 336; *McDonald v. Fithian*, 1 Gil. [Ill.], 269 ; *Cook
v. Lamotte*, 11 Eng. L. & Eq., 26 ; *Hoghton v. Hoghton*, Id.,
124; 1 Story, Eq., secs. 193 and cases, 246–8, 251 ; Bige-
low, Fraud, secs. 366–7, 414–15, 522–4 ; *Gammil's Heirs
v. Johnson*, 1 S. W. Rep., 610 ; *Morgan v. Dinges*, 23 Neb.,
271 ; 3 Field, Lawyers' Briefs, sec. 112 ; *Harter v. Taggart*,
14 O. St., 122 ; Gary, Prob. Law, sec. 377.

*Windham & Davies*, and *E. H. Wooley*, contra, cited:
Story, Eq. Jur., secs. 195–7, 199–207, 693 ; *Christmas v.
Spink*, 15 O., 600 ; *Steele v. Worthington*, 2 Id., 182 ; *Beebe
v. Swartwout*, 8 Ill., 162 ; *Clark v. Tennant*, 5 Neb., 556 ;
*First Nat. Bk. v. Yocum*, 11 Id., 330 ; *Foley v. Cowgill*, 32
Am. Dec. [Ky.], 49 ; *Williams v. Hicks*, 19 Id. [Vt.], 693 ;
*Vernon v. Keys*, 12 East [Eng.], 637 ; *Dupont v. Payton*,

2 E. D. Smith [N. Y.], 424; *Picard v. McCormick,* 11
Mich , 68; *Ellis v. Andrews,* 56 N. Y., 83; *Kimball v.
Cunningham,* 4 Mass., 502 [3 Am. Dec., 230]; *Carneal v.
May,* 2 A. K. Marsh. [Ky.], 587 [12 Am. Dec., 453];
*Curtiss v. Howell,* 39 N. Y., 215; *Bartlett v. Drake,* 100
Mass., 176; *Thurston v. Blanchard,* 22 Pick. [Mass.], 18;
*Jennings v. Gage,* 13 Ill., 610; *Utter v. Stewart,* 30 Barb.
[N. Y.], 20; *Williams v. Sturdevant,* 27 Ala., 598; *Bridg-
man v. Green,* 2 Ves., Sr. [Eng.], 627.

NORVAL, J.

This suit was instituted in the district court of Cass
county, against George R. Conna, to cancel—as being a for-
gery—a deed placed upon the records of said county, pur-
porting to have been executed by one Elizabeth Stafford
to said George R. Conna, covering 106⅔ acres of the south
half of section 8, township 10, range 11, in said county.
The petition of the plaintiff alleges:

"1. That on the 9th day of February, 1886, and imme-
diately prior thereto, Lizzie M. Safford, niece and heir of
the late John Whitelock, was the owner in fee of the fol-
lowing described premises, viz.: all that certain piece of
land commencing at a point on section line 106⅔ rods west
of the southeast corner of section 8, township 10 north,
of range 11 east, of the sixth principal meridian, and
running thence west along said section line 106⅔ rods,
thence north 160 rods to half section line of said section 8,
from thence east 106⅔ rods along said half section line,
and from thence 160 rods to place of beginning, being 106⅔
acres, more or less, and a part of said section 8, in Cass
county, Nebraska.

" 2. Plaintiff further complaining avers that on the 28th
day of October, 1887, the said Lizzie M. Safford, and her
husband, Hiram S. Safford, by good and sufficient deed and
for a valuable consideration, conveyed to her as a title in fee

to said above described land, and that she is now the complete and sole owner of the title to said land, and all the interest of Lizzie M. Safford therein; a copy of said deed is hereto attached, marked 'Ex. A' and made a part of this petition.

"3. And plaintiff further avers and complains that on March 5, 1886, at 11:30 A. M., the said George R. Conna filed in the office of the county clerk of Cass county, Nebraska, for record, a pretended deed to the land herein described, purporting to run from Elizabeth Stafford, an unmarried woman, and a resident of Galveston, Texas; said deed purports to have been made in Galveston, in the county of Galveston, Texas, on the 9th day of February, A. D. 1886, and to be acknowledged before one G. W. Bromide, notary public of said county, and to be witnessed by one James Rider and one J. P. Cooper. Now plaintiff alleges that said pretended deed is a fraudulent conveyance; that there is no such person as Elizabeth Stafford, who has now or ever has had an interest in said described land; that there is no such notary as G. W. Bromide, or witnesses James Rider and J. P. Cooper, in Galveston, Texas, now, or at the time of the execution of said deed as therein indicated; wherefore plaintiff alleges that said deed is a fraud, and that the record of the same makes an illegal and fraudulent incumbrance upon plaintiff's title to said property, the name of Elizabeth Stafford, appearing to said deed as grantor, being a forgery.

"4. Now, plaintiff further avers that Lizzie M. Safford, the heir of John Whitelock, deceased, and a married woman, was, at the time of John Whitelock's death and at the date of the fraudulent conveyance herein described, a married woman; her home being in Oakland, Alameda county, California; that she did not sign the pretended deed to George R. Conna, defendant; that she had no knowledge of its existence for a long time after its record in Cass county."

The prayer was for the cancellation of the deed, and that the title of the land be quieted in the plaintiff.

Afterwards Elizabeth M. Safford and Hiram S. Safford were permitted to intervene and file an answer and cross-bill, alleging therein :

"1. That these defendants are the grantors in the deed made, executed, and delivered to plaintiff October 28, 1887, purporting to convey to said plaintiff the lands in said petition described, and by which deed she alleges title thereto, and that said deed was so delivered to plaintiff for the money consideration therein named, of ten dollars.

"2. Defendants allege that in or about the month of June, 1872, they moved their place of residence from Washington, D. C., to the territory of Nevada; from there they moved to Alameda county, in the state of California, about the month of November, A. D. 1879, at which latter place defendants have ever since, and do now there reside, their postoffice during all of said time being the city of Oakland, in said county and state.

"3. That ever since these defendants so moved their residence from Washington, D. C., their exact whereabouts has at all times been known to their relations who were living in the eastern states, but were especially and particularly known by the plaintiff herein and her father and mother, John and Rebecca Delorac, and that said plaintiff and her mother are now, and for a long time past have been, residents of the city of Cincinnati, in the state of Ohio.

"4. That the mother of this defendant, Elizabeth M. Safford, and the mother of plaintiff, and one John Whitelock, now deceased, and one Elizabeth Maltas, were brother and sisters.

"5. That some time in the month of September, 1883, the said John Whitelock, being then a resident of Hamilton county, in the state of Ohio, died, leaving an estate of which said plaintiff's mother, Rebecca Delorac, Elizabeth

Maltas, and the defendant herein, Elizabeth M. Safford, were the sole heirs and legatees; this defendant acquiring a one-third interest by right of representation of her mother, who had died long prior to decease of the said John Whitelock; this defendant being her sole and only child and heir.

"6. That said Rebecca Delorac and Elizabeth Maltas had the probate court of Hamilton county, Ohio, probate and administer upon said estate, real and personal, and instituted a suit in the district court of Cass county, Nebraska, wherein and whereby they caused the lands belonging to said estate and all of which were situated in said Cass county, Nebraska, to be partitioned and divided between said Rebecca Delorac, Elizabeth Maltas, and this defendant, Elizabeth M. Safford; there being set apart to each 106⅔ acres of land.

"7. That neither of these defendants have ever been informed by any of the parties or heirs of any person, directly or indirectly, of the death of said John Whitelock, of the probating of his estate, or that the defendant herein, Elizabeth M. Safford, was an heir or legatee of any portion of said estate, but that each of them have, at all times, been in total ignorance of each and all facts hereinbefore alleged and set forth in paragraphs 5 and 6.

"8. That on or about October 9, 1889, the plaintiff herein came to the home of these defendants in Alameda county, California, for the purpose, ostensibly, of making a friendly visit, but, in truth and in fact, for the sole purpose of cheating and defrauding said defendants out of their interest in the estate of John Whitelock, deceased, (she being well informed of the value thereof, and well knowing that said defendants were wholly ignorant of the death of said John Whitelock, and the existence of any estate or part thereof descending to them); and for the purpose aforesaid, of cheating and defrauding them out of their interest of said estate, did willfully, falsely, and fraud-

ulently, for the purpose of deceiving and cheating said defendants, inform them that her father, John Delorac, had died last spring, and that said John Whitelock had died before in September, 1886, when, in truth and fact, he had been dead for about five years. Said plaintiff further informed these defendants that he, the said John Whitelock, deceased, had left a little property—a very little—that it was of very small value, consisting of five or six hundred dollars in money, which was in the hands of her mother, and about one hundred acres of land, which was wild and uncultivated and unproductive; that it was located on the frontier beyond the confines of civilization, and while it was of no particular value now it might be some day; that her mother had given Elizabeth Maltas a few acres of land, and that she, Elizabeth Maltas, and her husband were living in Chicago, and that she had taken care of said John Whitelock for a long time prior to his death; that he had been a great care and was the cause of much anxiety and was a great expense to her, and that she had not received any compensation therefor, and that inasmuch as the defendant herein, Elizabeth M. Safford, had been to no care or expense of the said John Whitelock, deceased, and as her interest in said estate was of such small value, the land would be a burden instead of a source of income, she was willing to take said interest as a partial compensation for her services, care, and expense in and about said John Whitelock prior to his death, and would pay the defendant herein, Elizabeth M. Safford, a nominal consideration therefor, of ten dollars; and that this defendant ought to be willing to do so, as she would have never known of her interest in said estate if plaintiff had not informed her, and that she could not get her interest out of said estate without the consent of said plaintiff's mother; all of which statements were wholly false and untrue at the time she so made them; that, in truth and in fact, there was a one-half section of land belonging to said estate in

which this defendant, Elizabeth M. Safford, had a one-third interest, or about 106⅔ acres, which had been definitely and finally set apart to this defendant, Elizabeth M. Safford, the title of which wholly vested in her in fee simple; that it was rich, fertile, and very productive, and was of great value, to-wit, four thousand dollars; that said land was located in a thickly settled portion of the country, and about four miles from the village of Weeping Water, Cass county, Nebraska; that the real value of all the land belonging to said estate in said county was about twelve thousand dollars; that there was about seven or eight hundred dollars in money under the control of the probate court of Hamilton county, Ohio, and subject to its order, and none of it being in the care, custody, or control of the mother of said plaintiff, and the defendant herein, Elizabeth M. Safford, had a vested and equal right in said money the same as plaintiff's mother; that said plaintiff had at no time ever performed any service, or cared for, or nursed the said John Whitelock prior to his death, or been to any expense for him, and that all of such services, care, and expense had been performed and incurred by plaintiff's mother, who had filed a claim for the same against the estate of said John Whitelock in the probate court of Hamilton county, Ohio, which claim had been fully adjudicated by said court and upon its order paid to the said clamant.

" 9. That these defendants, having no other information, and fully believing and relying upon the false, fraudulent, and untrue statements so made by plaintiff, and having their sympathy aroused and excited by reason thereof, did make, execute, and deliver said deed for the consideration therein named, conveying said lands to plaintiff.

"10. That at the time said deed was produced by plaintiff for the signature of these defendants, they for the first time learned that their interest was in an undivided one-third of a half section of land, and upon inquiry of plaintiff by

defendants as to its value she again informed them that the statements she had made were true, and while it had been appraised at ten dollars an acre, said appraisement was surely speculative and far beyond any reasonable and fair value; that the land was almost worthless, and would not much more than pay expenses; and being thus assured by said false and untrue statements and relying thereon, and wishing to pay their portion of the expenses of nursing in the last sickness of the said John Whitelock, deceased, and fully believing from plaintiff's statements that the same had been performed and incurred by said plaintiff, and that she has not been compensated, then executed and delivered said deed.

"11. That defendants further allege that in the partition suit hereinbefore alleged and mentioned, and in which suit the defendant therein designated, through mistake and inadvertence by the name of Elizabeth Stafford, and the decree of partition therein, vest the title of said defendant's interests in said lands by that name.

"12. That these defendants further allege that the pretended deed set forth and described in plaintiff's petition, purporting to convey said land therein described from one Elizabeth Stafford to one George R. Conna, is a cloud on the title of these defendants, and that no title or interest was ever conveyed by said deed, which was forged and placed on record by some person or persons unknown to these defendants, and for the purpose of defrauding them of the title and interest they have in and to said land.

"13. These defendants now bring into this court the money consideration of said deed from them to plaintiff, to-wit, ten dollars, and tender the same to her and leave it subject to the order of said court.

"Wherefore defendants pray that the deeds purporting to be from Elizabeth Stafford to George R. Conna be found false, fraudulent, and forged, and of no force or effect in law, and that it be set aside and the record thereof

be expunged; and that the court find the deed from these defendants to plaintiff was procured by fraud and without consideration, and that it be declared null and void, and of no force or effect in law or equity, and that the record thereof be expunged and the title to said premises and lands described in plaintiff's petition be forever vested and quieted in the defendants herein, under and by the name of Elizabeth M. Safford, and that she be decreed to be the sole and the true owner thereof, and that this court require these defendants to do and perform to and for plaintiff whatever in equity they have herein neglected to do or offer to do, and that they have judgment for their costs herein expended, and for such other relief as may be equitable in the premises."

The plaintiff replied to the answer and cross-bill of the defendants, denying all allegations of fraud, and alleging full and adequate consideration for the deed.

The district court found that the pretended deed to George R. Conna from Elizabeth M. Safford is a forgery, also found the issues against the intervening defendants, and quieted the title to the land in the plaintiff. The Saffords appeal.

That the deed to Conna was forged is undisputed. The only question we are called to pass upon is this: Did the plaintiff obtain the deed through fraud and deceit? The undisputed testimony shows that one John Whitelock died September, 1883, in Cincinnati, Hamilton county, Ohio; that at the time of his death he had personal property of the value of $3,600 and also owned a half section of land near Weeping Water, Nebraska; that the plaintiff's mother, Rebecca Delorac, the defendant Elizabeth M. Safford, and one Elizabeth Maltas were his sole and only heirs, each being entitled to one-third of the estate. The estate was probated in Hamilton county, Ohio, the father of the plaintiff being appointed administrator. After the payment of all debts and expenses of administration, the probate court made an

order of distribution of the personalty; the share of the
defendant Elizabeth M. Safford being $683.99.   It also
appears from the testimony that John Whitelock, for many
years prior to his death, made his home with the father and
mother of the plaintiff; that the administrator, in making
his final report, returned as having paid to plaintiff's
mother, Rebecca Delorac, the sum of $2,500 for furnished
apartments and personal attendance supplied to John
Whitelock from 1848 to 1883.   An exception was filed to
this item of the report and on the hearing the court allowed
a portion of the claim, the sum of $936.   The defendants
Safford have been residents of California since October,
1879, and were not aware of the death of John Whitelock,
nor of the value of his estate, until informed by the plaint-
iff at the time she procured from them the deed for the
land in Cass county.   At the time of procuring this deed,
Whitelock had been dead some four years, and while the
plaintiff knew of the whereabouts of Mrs. Safford, she
failed to inform her of Whitelock's death.   The testimony
also shows that Elizabeth Maltas, one of the heirs, has been
living on the land for several years before the deed was
executed to the plaintiff.   The land was worth from $25
to $30 per acre.

Hiram S. Safford, one of the intervening defendants, tes-
tifies that John Whitelock was his wife's uncle; that early
in October, 1887, the plaintiff visited the defendants at
their home in Oakland, California, for the purpose of pur-
chasing Mrs. Safford's interest in her uncle's estate; that
at that time, the plaintiff represented that Whitelock had
died in September, 1886, and had left an estate to be di-
vided between her mother, Rebecca Delorac, her aunt, Eliza-
beth Maltas, and my wife, Elizabeth M. Safford; that
there was between six and seven hundred dollars coming to
my wife, and that there was also real estate amounting to
about one hundred acres, which I first understood to be the
entire amount of real estate, and that all this property was

under the control of her mother; that the land was in Nebraska, was wild, unproductive, and of but little or no value, and that her mother had given the Maltas family a few acres to keep them quiet.   On October 27, the day before the deed was signed, she produced a blank deed prepared for signature, showing that there were three hundred and twenty acres of land, which surprised me very much. I asked her then as to the exact value of the land and she said the highest estimate placed on it was ten dollars per acre, but this was far above its real worth.   Although my wife and I had no idea the land was so valuable, as we had promised to deed it to her, we did so.   We had no information as to the value and character of the land prior to the making of the deed, except the statement of the plaintiff, nor did we know that the estate had been administered on, or that the land had been partitioned.

The witness further testifies in answer to questions as follows:

Q. State if you and your wife are the parties who deeded the land in controversy in this action to Mary Delorac, the plaintiff herein.

A. Yes, sir.

Q. What was the consideration for that deed?

A. Ten dollars was expressed in the deed, and the further consideration of the services of Mary Delorac in taking care of John Whitelock during his last sickness and before.

Q. State whether or not Mary Delorac told you who took care of John Whitelock prior to his death and whether she told you that the services therefor had ever been paid to any one out of his estate.

A. She said she had almost the entire charge of him for years, and did not state that any one had been paid for the services.

Q. Did you know at the time of making the deed to Mary Delorac that any one claimed a bill for services ren-

dered in nursing John Whitelock in his lifetime, and that any part of said bill had been allowed by the probate court of Hamilton county, Ohio, against his estate?

A. No, sir.

Q. What, if anything, did Mary Delorac say as to the trouble, annoyance, and expense John Whitelock had been to her personally?

A. She said he had been the source of considerable annoyance and trouble to her; being somewhat dissipated and she having more control over him, took particular charge of him most of the time.

Q. State whether or not Mary Delorac told you what interest Elizabeth Maltas and her husband had in the lands of John Whitelock.

A. She said her mother had given them a few acres of the land to keep them quiet.

Q. Did Mary Delorac tell you while at your place in Oakland, in 1887, where Elizabeth Maltas and her husband were then living?

A. Yes, sir; she said they lived in Chicago, Illinois.

Q. What knowledge, if any, did you have of the value, character, or location of the lands in dispute at the time you executed the deed therefor, except what had been told you by Mary Delorac?

A. None whatever.

Q. State whether or not you believed, relied, and acted upon the statements made by Mary Delorac to you in regard to the land and her care of John Whitelock?

A. Yes, sir.

Q. State whether or not the representations as made by Mary Delorac and your belief in them affected or controlled your actions in disposing of said lands, and, if so, how.

A. It did; if we had known the true facts of the case we would not have deeded the property to her.

Q. Did you receive more than the ten dollars consideration expressed in the deed, and, if so, how much?

A. There was a payment made to us by Mary Delorac of five hundred dollars as a consideration for the personal property and other interests that my wife might have in the estate of John Whitelock.

Q. Was any part of the five hundred dollars paid as consideration for the land?

A. The personal property and real estate were linked together in the payment of this five hundred dollars. Personal property amounted to about seven hundred dollars in money.

The testimony of Elizabeth M. Safford is substantially the same as that of her husband. It further appears from the testimony of both of the Saffords and J. L. Hanna, postmaster of Oakland, California, that the plaintiff on the 26th day of October, 1887, went to the postoffice in Oakland and signed Mrs. Safford's name to a written order to forward all of her mail to Cincinnati, Ohio, in care of Alva Parker, a personal friend of the plaintiff. On the same day a letter was received at the postoffice at Oakland addressed to Mrs. Safford, and written by one William H. Pugh, an attorney at Cincinnati, informing her that she was interested in the estate of John Whitelock, deceased, and that between six and seven hundred dollars were due her from the personal estate, which letter Mrs. Safford failed to receive until long after the making of the deed, because it was forwarded by the postmaster of Oakland to Cincinnati in pursuance of the written request of the plaintiff.

William H. Pugh testifies that he is an attorney at law, practicing in Cincinnati, that he represented the interests of Elizabeth Maltas in the settlement of the estate of John Whitelock, deceased; that the plaintiff filed no claim against said estate; that M. T. Delorac, father of the plaintiff, was the administrator of the estate; that personal property to the amount of $3,600 came into the hands of the administrator; that on March 6, 1885, M. T. Delorac,

as such administrator, filed his account, in which there was an item of payment of $2,500 to Rebecca Delorac, his wife, for furnished apartments, and personal attendance supplied to the deceased from May, 1848, to September, 1883, "to which item, as the attorney for Mrs. Maltas, I filed an exception. On the hearing of the exception the said Rebecca Delorac, to whom the claim was returned paid, testified that her deceased brother at the time of his death did not owe her $2,500 or any other sum, but that her daughter Mary and her father and her brother wanted her to file the claim. Mary, her daughter, the plaintiff herein, was present during the entire examination and when I was examining the witnesses, prompted and directed them how to answer, until the court, after having cautioned her two or three times not to interfere with the witnesses, ordered her to sit on the opposite side of the room from which the examination was going on. While so sitting I examined her mother. I asked her if John Whitelock owed her $2,500 or any other sum at his death? The mother hesitated and would not answer and Mary thereupon shouted out " tell him yes he did.". The court then ordered the sheriff to take her from the court room. She then walked in the adjoining room, where the sheriff kept her in charge during the rest of the examination or until she was called to testify. She was then sworn and testified in behalf of her mother's claim, saying that her mother was entitled to the money; that both she and her mother should be paid for it, and on Mary's testimony and her father's the court allowed a portion of the claim, amounting to $936." The witness further testifies that the plaintiff called on him just before she left for San Francisco to obtain the interest of Elizabeth Safford in said estate, when the witness inquired of her if she knew anything of the whereabouts of Elizabeth Safford; that she refused to give him any satisfaction, neither did she impart any information of her intention to go there, but the day following her departure he was informed that she

had gone to San Francisco to obtain from Elizabeth Safford her interest in said estate. He immediately wrote a letter and inclosed it in an envelope, directed it to Elizabeth Safford, care of Hiram Safford, Oakland, California, duly stamped the same, and deposited it in the postoffice of Cincinati, which letter was returned to the witness from Oakland unopened and marked on the envelope "Return to Cincinnati in the care of Alva Parker."

Mary Delorac, the plaintiff, testifies that she purchased the land October 28, 1887; that the consideration was ten dollars, the amount mentioned in the deed, and the mortification and humiliation she had to contend with by the presence of Whitelock at her father's house during nearly all her life; that he was ragged, dirty, and filthy, by reason of habits of intoxication, often coming into the parlor and other parts of the house when plaintiff had company, once exposing his person; he entered plaintiff's church in a beastly condition, when she was obliged to coax him home and remain with him; annoyed her by his intoxication while she was attending school; that Whitelock made his home with plaintiff's parents for thirty-five years prior to his death, and that plaintiff cared for him; that he was frequently so drunk that he was almost helpless; ofttimes in the dead of night, when brought home by police, she would get up and care for him, and that the care of her uncle was a great strain on her nervous system.

The plaintiff, being interrogated as to the conversation that took place between her and the defendants at their home in Oakland, touching their interest in John Whitelock's estate prior to their making of the deed to the plaintiff, answered: "The next day, Monday, after I arrived at their home, my cousin and myself were setting in the room I occupied as a bedroom. I then told her of my uncle's death, that he left money and land in Cass county, Nebraska, and that she was one of the heirs; that her portion of the estate was six or seven hundred dollars, the exact

amount I did not know, and a little over one hundred acres of land ; that her aunt, Mrs. Maltas, had sent affidavit, saying she believed her dead and had no children, to the probate court in Cincinnati, asking for distribution of her money. On seeing the notice my mother received. to that effect, I immediately went to my father's attorney and asked him to stop the proceedings as there was no reason to believe she was dead; and I said, Lizzie, you know that John made his home with us so many years, and was in the habit of getting on sprees as you saw once when on a visit to our home about twenty years ago, and when in this condition was a great annoyance and humiliation to us and a great anxiety, more particularly to me. I often deprived myself of company I would otherwise have encouraged had it not been for him. I also told her that he was paralyzed in his last illness and I nursed him, and in lifting him I sprained my wrist, and the doctors say I would never have the same use of my hand again. She saw my wrist and saw I suffered pain with it; and Lizzie, you know you and your parents had none of the care and humiliation on account of John, and now I thought I would come and see you in person as I had no reason to think you were dead, as Mrs. Maltas swore, and ask if you would be willing to give me something of the estate of. Uncle John, as I had so much to contend with and you escaped all that. Yes, she said, she knew John was in the habit of getting intoxicated as she had seen at our house. She remarked she thought it was very wicked of Mrs. Maltas to talk that way, and that she thought we ought to have all John left, and would go down and get pen and ink and assign me her entire interest, as she thought I ought to have it. I thanked her and said, no, you must consult your husband first; so the matter dropped there for that day. In the evening, after I retired, she told her husband of the conversation. Next morning she told me her husband told her she must not assign her interest

to me until he had a conversation with me. On Tuesday evening, the second day after I arrived, October 11, she sent her daughter Clara upstairs, saying she did not want her daughter to know that she had such a relative as Uncle John as she had never spoken of him in her presence. Mr. Safford commenced the conversation by saying, Lizzie tells me that her Uncle John is dead and left an estate, Lizzie's interest being six or seven hundred dollars in money and a little over one hundred acres of land in Cass county, Nebraska. He asked who was appointed administrator; I said my father was. He then asked whether John died before my father; I said yes. He asked how long father had been dead; I told him he died last year, in March. (This conversation took place in 1887.) Uncle John died August 29, and was buried September 1. I told them of the affidavit of Mrs. Maltas just as I had told my cousin the day before, and if it had not been for me stopping the distribution of the money and coming out and telling you, you never would have known it, for my mother and Mrs. Maltas wanted your share. I then told them of uncle living at our home so many years, what a mortification his personal appearance and intoxication was to me; that when I told my mother I was coming out to see you, Lizzie, she begged me to stay at home and said the judge would divide the money and you can have my share. I said no, if I received any of it, it must come from Lizzie herself, so I thought I would come and see you and see if you would do anything for me, as I had so much to contend with in John, speaking of his personal appearance, habits of intoxication, and the mortification and humiliation I endured, at the same time showing them five affidavits corroborating what I had said of my uncle. He then asked me how much the land was worth. I told him I did not know, it was wild land, just as my uncle left it. He then asked, what do you propose? I said, if you and Lizzie are willing I would like

to buy your interest in the estate for five hundred dollars. He then said, I am willing if Lizzie is; Lizzie consented. That about ended our conversation for that evening.  My cousin Lizzie, one day after, remarked, that land I am going to deed to you may be worth a great deal of money some day.  She several times remarked, we would not take one cent as I think you ought to have it all, but Mr. Safford has lost a great deal in gold mines and some day I hope to return every cent to you.  The evening before the deed was signed I told them I had $500 at Wells, Fargo & Co.'s express and that if they wished to deed me the land, and sell their interest in the estate as they had promised, I had the money to pay them for the same.  He then asked, How many acres did you say?  I said a little over 100, about 106 acres.  He first said, there is more land than I thought.  I do not know how you misunderstood me, I spoke in plain English when I told Lizzie's interest was a little over 100 acres.  He asked if Mrs. Maltas received her interest in the land; I told him yes, she deeded nothing to us; but notwithstanding what the Maltases did or did not, I hope it will not interfere with your promises to me.  He said, we will do as we originally promised; we will deed you the land.  He asked me how much per acre the land was appraised at.  I said I believed it was $10 per acre, as far as my memory served me.  He then asked, have you got a description of the land?  I said yes, I have a deed upstairs and will go up and get it.  I gave it to him.  He read it, and said he would see what meridian it was in.  I said, what you do for me you must do of your own free will, otherwise I do not want it.  He then said, we will go over to San Francisco to-morrow and have the deed executed.  He kept the deed in his own possession until its execution, about eleven o'clock the next morning.

The plaintiff further testifies that she had never seen the land in Cass county and did not know its value, but had a vague remembrance that it was appraised at $10 per acre.

It is undisputed that the defendants were ignorant of the death of John Whitelock until informed thereof by the plaintiff; that Mrs. Safford was entitled to one-third of the half section of land, and that when the plaintiff obtained from the defendants a deed therefor, it was worth at least $25 per acre, and that they knew nothing of its location or value is not questioned. That the plaintiff's statements led the Saffords to believe that the land was of but little or no value is fully sustained by the testimony of both of the defendants, and their testimony is corroborated by that of the plaintiff when she states that Mrs. Safford told her one day " that land I am going to deed to you may be worth a great deal of money some day." While it is true the plaintiff testifies she did not know its value, there are many circumstances which tend to discredit her testimony. The ordering of Mrs. Safford's letters to be forwarded from Oakland to Cincinnati in care of plaintiff's friend, Alva Parker, is very suspicious. The plaintiff's explanation of this is that she received while in California a letter from her mother saying that she had had Alva Parker write a letter for her to Mrs. Safford at Oakland, and if the letter was not delivered to have it returned to Cincinnati in Parker's care. The plaintiff claims that, in pursuance of this request, she ordered the mail forwarded and that the letter was returned. The envelope which plaintiff claims contained the returned letter was introduced in evidence, yet the letter, though in existence, was not produced, nor was the mother called to corroborate the plaintiff's statement that she had ever requested any letter returned. It is indeed strange that the letter should be forwarded to Parker, rather than to the mother, who, plaintiff claims, sent it. It appears from the testimony of Mr. Pugh, an attorney, who represented Mrs. Maltas, one of the heirs, that he had been for a long time trying to ascertain the address of Mrs. Safford and had even inquired of the plaintiff, just before starting on her trip to

the coast, where Mrs. Safford lived, and that the plaintiff refused to give him the information.    It is also in evidence that while the plaintiff was visiting with the defendants in California, her mother had given Mr. Pugh the defendant's address and that he thereupon wrote Mrs. Safford that she was an heir of John Whitelock and that there were several hundred dollars coming to her from his estate.    Doubtless it was this information that the plaintiff was seeking to keep from the defendant that caused the order to be given for the forwarding of the mail to Cincinnati.    This letter of Pugh's was returned to Parker and but for the plaintiff's order given to the postmaster at Oakland, it would have been received by the defendants before the deed was executed.

Again, the plaintiff informs the defendant that Mrs. Maltas, one of the heirs, was living in Chicago, while, at the time, she was residing in Cass county on the land in dispute, which plaintiff well knew.    We do not believe that the plaintiff was entirely ignorant of the value of the land.    She had been living for years with her mother, who owned one-third of the land, which the mother had been advised was worth $25 per acre.    In all probability, it was the subject of frequent conversation in the family.    It is improbable that the plaintiff crossed the continent with the sole object to purchase the land from the defendants without knowing something near its value.    The testimony convinces us that the plaintiff represented that the land was of little value.    Her statement in that regard was a misrepresentation of a material fact, for which she is responsible, whether made willfully or not.    The defendants had a right to rely upon her positive statements, as they had never seen the land, and were entirely ignorant as to its situation or value.    The defendants, instead of conveying property which they were led by the plaintiff to believe was worth but little, parted with the title to real estate worth over $2,500.

It is urged that the defendants have not placed the plaintiff in *statu quo*, hence, it would be inequitable to cancel the deed. They have offered back $10, the consideration paid for the deed. True, the plaintiff, as a part of the same transaction, paid Mrs. Safford $500 for her interest in the personal estate of the deceased. The plaintiff, however, has received in cash from the estate $650 that belonged to Mrs. Safford. So, in reality, the plaintiff has received back every dollar she paid, and $150 besides.

The rule frequently followed by this court, to the effect that the findings of the district court will not be molested when there is sufficient evidence to sustain it, has not the same application in a case tried upon depositions as where the witnesses appear and testify in open court. Where the witnesses are examined before the court, such court, by seeing and hearing the witnesses, has a decided advantage over a reviewing court in weighing their testimony. The entire testimony in this case, relating to the representations of the plaintiff, was taken by deposition.

The decree of the district court, so far as it quieted the title to the land in the plaintiff, is reversed, and a decree will be entered in this court canceling the deed obtained by the plaintiff from the defendants, and quieting the title of the defendant, Elizabeth M. Safford. The decree of the court below canceling the deed purporting to have been given by Elizabeth M. Safford to George R. Conna is affirmed.

JUDGMENT ACCORDINGLY.

THE other judges concur.